COMMERCIAL SECURITY COMPANY *v.* LEE *et al.*

1. The act of the General Assembly, approved August 19, 1916 (Acts 1916, p. 155), which undertakes to prohibit what is termed "popularity contests," is in conflict with the equal-protection clauses of the constitutions of the State and the United States (Civil Code, §§ 6358, 6700), and is therefore void, because it excepts a part of a class from its operation, thus making a classification which amounts to a denial of the equal protection of the law.

2. The ordinance of the City of Covington which seeks to prohibit merchants and dealers in merchandise of any kind from offering gifts to induce trade is invalid, because there is no specific authority for such legislation in the charter of that municipality, and the same is not authorized under the general-welfare clause.

3. The suit was based upon promissory notes given for merchandise intended to be used as gifts or prizes in what has been termed "popularity contests," which notes had been transferred to a bona fide holder before maturity. The defendant filed a plea alleging that the notes sued upon were void, because they were given for a purpose prohibited by the act of the General Assembly approved August 19, 1916, and by the ordinance of the City of Covington mentioned in headnote 2, and therefore were immoral and illegal. The plaintiff interposed demurrers to the plea, which were overruled by the court, after which judgment was rendered for the defendants. *Held*, that the judgment overruling the plaintiff's demurrer to the defendants' plea was erroneous, said plea being based upon the unconstitutional statute and ordinance.

No. 997. NOVEMBER 19, 1918.

Complaint. Before Judge Smith. Newton superior court. April 23, 1918.

The defendants contracted with Partin Manufacturing Company for the furnishing by the latter of advertising matter, services, and prizes to be awarded to winners in connection with an "enterprise" to be conducted for the purpose of increasing the business of the defendants, and in settlement gave certain promissory notes. The plaintiff sued for the amount due on two of these notes, alleging that it became, before maturity, a bona fide holder for value, and that the same are past due and unpaid. The defendants pleaded that the notes were null and void, because the articles in consideration for which they were given were to have been used in the prosecution of an enterprise which would have been illegal, against good morals, and in violation of the act of the General Assembly approved Aug. 19, 1916 (Acts 1916, p. 155), and of section 83 of the code of the City of Covington.

The material part of the act of the General Assembly in question is as follows: "That it shall be unlawful for any person,

firm, or corporation to set up, carry on, conduct, manage, operate, or otherwise promote what is commonly known as a 'popularity contest,' whereby any ticket, writing, paper, certificate, token, device, or other thing whatever is given with the subscription to any publication, or with the purchase of any article of merchandise, or theatrical ticket, purporting, designated, or intended to give or entitle the holder, or any other person, to participate in any contest whereby anything of value is offered as a prize. Provided, however, that the provisions of this act shall not apply to weekly newspapers which have no connection with any daily paper and which do not have a circulation of over 4,000 subscribers."

By the ordinance of the City of Covington it is enacted:

(1) "No merchant or dealer in merchandise of any kind shall offer any prize, gift, or chance as a prize or gift, to induce the sale of his goods or wares."

(2) "Any person found guilty of violating any of the terms of this ordinance shall, on conviction before the mayor's court, be punished as prescribed," etc.

The plaintiff filed demurrers raising in detail various questions as to the constitutionality of the act of the General Assembly and the ordinance of the City of Covington. These were overruled; and by agreement the matter was tried by the court without the intervention of a jury, resulting in a finding for defendants. Exception was taken by the plaintiff to the overruling of its demurrer to the defendants' plea, and to the rendition of judgment in favor of the defendants.

*R. W. Milner, Moore & Pomeroy,* and *C. E. Cotterill,* for plaintiff.

*King & Johnson, Thomas S. Felder,* and *Pottle & Hofmayer,* for defendants.

GILBERT, J. 1. The things which the act of the General Assembly above quoted undertakes to prohibit are not mala in se. There can be nothing in the mere stimulation of trade or subscriptions to news publications by prizes or gifts that is, in itself, immoral. It is known in advance that whoever makes or secures the largest amount of purchases or subscriptions will receive the largest amount of voting power in the contest, and it is known that the rewards, called prizes, are given in proportion to the amount of votes. To deny this would be to impute fraud and

dishonesty, and we are not warranted in assuming that such an enterprise involves a vice of this character. Certainly the act in question does not undertake to deal with fraud. The scheme itself does not differ materially from the numerous methods of advertising in constant use in the channels of trade. It is rather a method of intensive personal advertising. It embodies some of the elements of traveling salesmanship, circularization, solicitation on commission, show-windows, signboards, profit-sharing, and other methods of like kind. Whether success is achieved by these methods does embody a certain element of chance, but so does every other species of advertising. The merchant who advertises in the newspaper takes the chance of his advertisement being read, whether it is read by a person in the market for such merchandise and whether such person will be impressed by the advertisement, whether he will act upon it and enter upon negotiation for the article advertised, and whether such negotiation will result in a sale; and so it is in every species of advertising. It is useless to multiply illustrations, however, to demonstrate that the acts are not in themselves immoral. The General Assembly, where rests the power of declaring the public policy of the State, left no doubt as to the lawmaking mind upon that question. In the act it is specifically provided that the provisions of the act shall not apply to weekly newspapers which have no connection with any daily newspaper and which do not have a circulation of over four thousand subscribers. It would be not only illogical and unfair, but it would be an injustice to the General Assembly, to declare that they intended to prohibit acts which they deemed immoral on the part of the public generally, and to except therefrom weekly newspapers of the class just mentioned. We do not mean to say that the legislature is without power to forbid or suppress a particular kind of business where such business, properly and honestly conducted, may not in itself be immoral. We hold the contrary view, where the tendency of what is generally and ordinarily or often done in pursuing that business may be towards that which is admittedly immoral or pernicious. *Arthur* v. *State,* 146 *Ga.* 827 (92 S. E. 637). The act, however, is unconstitutional. It is in direct violation of the equal-protection clauses of the State and Federal constitutions (embodied in the Code of 1910, §§ 6358, 6700). It constitutes an arbitrary and unreasonable exception in

dealing with the business affairs upon subjects not within themselves immoral or hurtful to the health, happiness, and safety of the public. Undoubtedly the lawmaking power may classify and provide penalties applicable to different classes, so long as the classification is fair and reasonable and all coming within the same class are treated alike. The classification in this act, however, is arbitrary and unreasonable. It applies a different rule to daily newspapers, and to monthly magazines, from that applied to weeklies. From the operation of the act generally it excepts newspapers of a single class, and within that class it makes a further classification excepting those which have no connection with any daily paper, and even among this classification it makes a still further classification and excepts only those newspapers which are weekly and not connected with any daily newspaper and which do not have a circulation of over 4000 subscribers.

It follows that the entire business world within the jurisdiction of this State are prohibited, under penalty of a misdemeanor, from doing the things mentioned in the act, except weekly newspapers not connected with a daily newspaper and not having a circulation of over 4000 subscribers. As a general rule the only newspapers coming within the excepted class would be those published in the smaller towns and cities of the State. Public policy, it is true, may vary with localities and times. *Mutual Life Ins. Co.* v. *Durden,* 9 *Ga. App.* 797, 799 (72 S. E. 295). We know of no test, however, by which we may declare an enterprise moral in some cities of the State and immoral in others. Morality is not to be restricted by statute to localities. If the contention of the defendants in error be correct, therefore, and should be adjudicated to be the law of this State, it must follow that in smaller towns and cities of Georgia projects of the class generally prohibited may be conducted by weekly newspapers having a circulation not exceeding 4000 subscribers, and yet in the larger cities a weekly newspaper connected with a daily paper and having a circulation of 3999, or any other number of subscribers less than 4000, would be prohibited. Moreover, it is a matter of common knowledge that the circulation of newspapers constantly varies. It varies from year to year, from month to month and from week to week, and on daily newspapers from day to day. It is perhaps safe to say that no two successive issues of any newspaper are the same.

If so, it is a rare exception. Circulation depends on many things, among them the enterprise, capital, and brains of the men who conduct them; the territory which may be quickly reached by them, and consequently the schedules of railroad trains and mails. It is also affected by the political fortunes, that is, whether the newspaper has recently espoused the cause of those who are successful in politics, or in municipal issues, such as public utilities, bond issues, and the like; whether it has given what is considered due prominence to persons and projects deemed of importance by the person interested. It is influenced by the prosperity of the times, the price of cotton, by war and peace, and especially by the rigidity or laxity employed in the collection of subscriptions and whether subscriptions are promptly canceled when the subscriber is in arrears.

It is quite possible, if not probable, that a weekly newspaper not connected with a daily may be published in a large city with a circulation of more than 4000, and yet, under the act in question, such a newspaper would be subject to criminal indictment and punishment as for a misdemeanor for conducting such an enterprise. Indeed, a newspaper coming entirely within the class sought to be excepted might inaugurate such an enterprise and, if successful, it might become a criminal before the termination of the same. For instance, if its circulation was 3500, the enterprise could be lawfully begun; but if it was successful and increased the circulation to 4000, the same enterprise which began lawfully would end unlawfully. It is easily conceivable that a weekly newspaper may be published in the country, and yet by the employment of great ability, capital, and enterprise the subscribers might easily far exceed 4000. In this event the inhibition of the statute against the employment of the enterprise would be a penalty visited upon enterprise and capacity. This we can not think is permissible under the provisions of the constitutions of the State and of the United States above mentioned. Many cases have been decided by the courts in reference to trading-stamps, coupons, etc., wherein it has been held that such enterprises did not come within the police power of the State, because they were not injurious to the public morals or the public safety. We see no difference, on principle, between these cases and the one now under consideration. *Tumlin Co.* v. *Daniel Co.,* 141 *Ga.* 613 (81

S. E. 793), and cases cited; Kanne *v.* Segerstrom Piano Mfg. Co., 118 Minn. 483 (137 N. W. 170, 41 L. R. A. (N. S.) 1041).

For these reasons we conclude that the act of the General Assembly approved August 19, 1916, prohibiting what is called "popularity contests," is unconstitutional and void.

2. We deem it unnecessary to deal in detail with the constitutionality of the ordinance of the City of Covington. This is a sweeping inhibition, applying to all merchants and dealers in merchandise, but to no other persons. It may be said, in passing, that the term "dealer in merchandise" is quite general, and in itself suggests uncertainty in regard to what it includes. However, these classes are prohibited from offering "any prize, gift, or chance as a prize or gift to induce the sale of his goods or wares."

It is not suggested that the charter of Covington contains any specific authority for such municipal legislation. The authority, if it exists at all, is in what is known as the general-welfare clause. We do not believe that the general-welfare clause commonly found in municipal charters is sufficiently elastic to authorize an ordinance of this kind.

The contract not being immoral in itself, and there being no valid and constitutional legislation, either by the General Assembly or by the City of Covington, prohibiting the same, it follows that the plea filed by the defendants constituted no legal defense to the suit on the notes; and accordingly the judgment overruling the demurrer was erroneous and must be set aside. See *Forbes Drug Co.* v. *Bernard Mfg. Co.,* 20 *Ga. App.* 270 (92 S. E. 1009).

3. The third headnote requires no elaboration.

*Judgment reversed. All the Justices concur.*